1

2

3

4

5

6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

ISRAEL SHURKIN, ET AL,

10                             No. C 04-3434 MJJ

        Plaintiffs,

11                             **ORDER GRANTING DEFENDANTS'**
                               **MOTION TO DISMISS**

    v.

12

13 GOLDEN STATE VINTNERS, INC., ET AL.,

14        Defendants.
   _____/

15

16                      **INTRODUCTION**

17        Before the Court is Defendants Golden State Vintners, Inc., Jeffrey J. Borwn, Jeffrey B.

18 O'Neill, John Kelleher, and O'Neill Acquisition Co., LLC's ("Defendants") motion to dismiss this

19 securities fraud lawsuit.  Plaintiff Israel Shurkin ("Plaintiff"), representing a purported class of all

20 purchasers of Golden State Vintners, Inc. stock between December 23, 2003 and April 23, 2004,

21 opposes the motion.  For the following reasons, the Court **GRANTS** Defendants' motion without

22 prejudice.

23                    **FACTUAL BACKGROUND**

24        Defendant Golden State Vintners, Inc. ("GSV" or the "Company"), is a producer of premium

25 bulk wines and a supplier of wine processing and storage services.  GSV went public in July 1998.

26 By 2003, GSV was one of the largest U.S. suppliers of premium wines, wine processing, barrel

27 fermentation and storage services, wine grapes, and case goods to California wineries and to several

28 international wineries.  According to Plaintiff, GSV had a "long history of losses coupled with

**United States District Court**

For the Northern District of California

**United States District Court**
For the Northern District of California

1   massive writedowns." (Complaint, ¶ 3.)  However, Plaintiff contends that in the first half of FY

2   2004 (July 1, 2003, through December 31, 2003),[1] GSV began to exhibit strong growth.

3          On September 12, 2003, GSV issued a press release proposing to its shareholders a going-

4   private reverse stock split transaction in which Class A and Class B common shares of GSV stock

5   would be consolidated on a 1-for-5,900 basis.  Stockholders owning a number of GSV shares not

6   evenly divisible by 5,900 would be paid $3.25 per pre-split share in lieu of a fraction of a post-split

7   share.  At the time, GSV's Class B common stock was trading at just over $2 per share.[2]  After the

8   announcement, GSV stock rose to approximately $3.00 per share.

9          On December 23, 2003, GSV filed a shareholder proxy solicitation statement ("Proxy") with

10  the SEC, explaining the going-private plan and disclosing the September 11, 2003, opinion of

11  investment bank Adams, Harkness & Hill ("AH&H"), hired to assess the proposed plan.

12  (Declaration of Jonathan C. Dickey ("Dickey Decl."), Ex. A (Proxy).)  AH&H opined that as of

13  September 11, 2003, $3.25 per share was "fair, from a financial point of view, to th[e]

14  [share]holders." (Complaint, ¶ 27.)[3]  The Proxy explained that the reason for the reverse split was a

15  savings of more than $900,000 annually in expenses associated with reporting requirements as a

16  public company.

17         According to Plaintiff's Complaint, on January 7, 2004, a third party (which Plaintiff now

18  contends was the Wine Group) expressed interest in acquiring GSV for a minimum of $5 per share.

19  Defendants did not disclose that expression of interest.  In its Opposition to the instant motion,

20  Plaintiff claims that on January 9, 2004, GSV's Board authorized the Wine Group to conduct due

21  diligence in connection with its offer, formed a special committee to negotiate with the Wine Group,

22  and agreed to hire legal counsel and financial advisors to evaluate the offer.  At the same meeting,

23  Defendant O'Neill, GSV's CEO, told the Board that he would explore making a competing offer to

24  _____

25         [1] GSV's fiscal year begins on July 1.

26         [2] Class A common stock was not publicly traded.

27         [3] On June 10, 2003, GSV's Board of Directors (seven out of eight of whom, including Defendant

28  Brown, were outside independent directors) appointed a special committee to evaluate the fairness, to the Company's stockholders, of the going-private plan.  The special committee was authorized to engage independent legal counsel and an independent financial adviser (AH&H) to assist.

2

United States District Court

For the Northern District of California

1  buy the Company.  On January 12, GSV's Board hired Citigroup Global Markets, Inc., to evaluate

2  the Wine Group's offer.  That same day, Defendant O'Neill registered O'Neill Acquisition Co., LLC

3  ("O'Neill Acquisition") with California's Secretary of State.[4]  On January 16, 2004, Defendant

4  O'Neill formally told GSV's Board that he would make a competing offer to acquire GSV.  On

5  January 19, 2004, O'Neill made a detailed presentation to the Board regarding GSV's strategic

6  alternatives and financial condition.  The Board then decided to suspend the reverse split

7  transaction.[5]

8       On January 20, 2004, GSV announced that its Board had "indefinitely suspended . . . the

9  going-private proposal described in the Company's definitive proxy statement."  The press release

10  explained that the plan was being terminated "in the best interests of stockholders" in light of

11  "recently improved business and market conditions."  (Complaint, ¶ 5.)  The press release further

12  stated that the Board needed time to "fully evaluate current conditions and the potential implications

13  for stockholder value" and that it had retained an investment banking firm "to advise the Company

14  in connection with its alternatives."  The press release said nothing about the Wine Group's

15  expressed interest or about O'Neill Acquisition's prose to make a competing offer.

16       Between January 7, 2004, when the Wine Group expressed interest in purchasing GSV, and

17  January 20, 2004, when GSV announced that it was suspending the going-private plan announced in

18  the December Proxy, Hank Uberoi and Doug BRatton, both members of O'Neill Acquisition,

19  purchased more than 160,000 shares of GSV stock for no more than $3.35 per share.

20       After the January 20, 2004, press release issued, a bidding war for the Company between

21  O'Neill Acquisition and the Wine Group ensued.  On February 24, 2004, GSV announced that it had

22  received two proposals to acquire the Company, including one from a group that included the

23  Company's CEO – Defendant O'Neill.  GSV's stock went up.  Between March 4 and 7, the Wine

24  Group's offer rose to $6.65 per share, then to $6.82 per share, and then O'Neill Acquisition raised its

25

26  [4] O'Neill Acquisition consisted of Defendant Jeffrey O'Neill, Paul Violich, Hank Uberoi,
    Sterling Management Trust, Peter Mullin, Scott Seligman, Doug Bratton, and William Hallman.

27

28  [5] With the exception of Defendant O'Neill's initial representation, on January 9, 2004, to the
    GSV Board that he would submit a competing offer, the events Plaintiff now alleges occurred on
    January 9, 12, 16, and 19, were not alleged in his Complaint.

3

offer to $6.85 per share.  According to Plaintiff, these facts were not disclosed to the public.  The

Wine Group made a new offer to acquire the Company for $7.25 per share.  O'Neill matched the

offer on March 24.  The Company reported the competing offers of $7.25.  Plaintiff now alleges (but

did not so allege in his Complaint) that O'Neill Acquisition's matching offer was subject to its

ability to obtain financing and the Wine Group's offer was not.  Despite this, Plaintiff now says,

GSV's Board accepted O'Neill Acquisition's proposal, causing the Wine Group to temporarily

withdraw from the competition and issue a press release that stated as follows:

> [The] O'Neill Group is still subject to a financing condition.  If their financing does not come together, for whatever reason, the stockholders of GSV are left with no liquidity event.  We don't understand how a properly functioning board of directors, when presented with our offer, can agree to a transaction that is contingent on the ability of a newly formed company to raise such a substantial amount of money.  The Wine Group's offers to acquire GSV have never been conditioned on financing.  We have concluded that under these circumstances it does not make sense for the Wine Group to bid against itself.

(Opposition at 7:3–14.)

The Wine Group re-entered the bidding war on April 9, 2004, offering $7.75 per share.  On

April 15, O'Neill Acquisition offered $7.80 per share.  On April 20, GSV announced that the Wine

Group had offered $8.25 per share and on April 23, the Company signed an agreement to sell to the

Wine Group at that price.  GSV's Board agreed to pay O'Neill a combined termination expense/fee

payment of $2.3 million because the Company was sold to a purchaser other than O'Neill

Acquisition.

Plaintiff, and other members of the purported class, sold thousands of shares of GSV stock

between December 23, 2004, and April 23, 2003, for no more than $3.34 per share.

In his Complaint, Plaintiff alleges that between December 23, 2003, and April 23, 2004,

Defendants violated Sections 10 and 20 of the Securities and Exchange Act of 1934 (the "Act") and

Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.  Plaintiff

contends that Defendants knowingly disseminated to the public materially false and misleading

statements concerning the financial prospects of GSV in an attempt to privately acquire the

Company at an artificially-deflated price.  Plaintiff also claims that Defendant O'Neill Acquisition

engaged in insider trading, violating Section 20(A) of the Act.  Plaintiff alleges that as a result of

United States District Court

For the Northern District of California

4

1   this conduct, the price of GSV shares was artificially depressed between December 23, 2003, and

2   April 23, 2004, causing millions of dollars in damages to Plaintiff and other shareholders who sold

3   their shares during that period.

4       Defendants filed the instant motion to dismiss pursuant to the Private Securities Litigation

5   Reform Act of 1995 ("PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil

6   Procedure, on the grounds that Plaintiff failed to plead his allegations with sufficient particularity.

7                              **LEGAL STANDARD**

8   **A.       Federal Rules of Civil Procedure**

9       A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the

10  pleading of insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc.,*

11  749 F.2d 530, 533-34 (9th Cir. 1984).  When deciding upon a motion to dismiss pursuant to Rule

12  12(b)(6), a court must take all of the material allegations in the plaintiff's complaint as true, and

13  construe them in the light most favorable to the plaintiff. *Parks School of Business, Inc. v.*

14  *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

15      In the context of a motion to dismiss, review is limited to the contents in the complaint.

16  *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995).  When

17  matters outside the pleading are presented to and accepted by the court, the motion to dismiss is

18  converted into one for summary judgment.  However, matters properly presented to the court, such

19  as those attached to the complaint and incorporated within its allegations, may be considered as part

20  of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555

21  n.19 (9th Cir. 1989).  Where a plaintiff fails to attach to the complaint documents referred to therein,

22  and upon which the complaint is premised, a defendant may attach to the motion to dismiss such

23  documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway*

24  *Exchange*, 169 F. Supp. 2d at 1164; *Branch v. Tunnell*, 14 F.3d 449, 44 (9th Cir. 1994) (overruled on

25  other grounds).  Thus, the district court may consider the full texts of documents that the complaint

26  only quotes in part. *See In re Stay Electronics Sec. Lit.*, 89 F.3d 1399, 1405 n.4 (1996), *cert denied*,

27  520 U.S. 1103 (1997).  This rule precludes plaintiffs "from surviving a Rule 12(b)(6) motion by

28  deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP,*

United States District Court
For the Northern District of California

*Inc.*, 146 F.3d 699, 705 (9th Cir. 1998).

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, Rule 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud. To meet the heightened pleading requirements of Rule 9(b), the Ninth Circuit has held that a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1547–49 (9th Cir. 1994).

In the securities context, the pleading requirements are even more stringent.

**B.      Private Securities Litigation Reform Act**

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995). The PSLRA strengthened the already-heightened pleading requirements of Rule 9(b). Under the PSLRA, actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of

*United States District Court*
For the Northern District of California

6

1   deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th

2   Cir. 1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion

3   by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. §78u-4(b)(1).

**ANALYSIS**

5   **I.      Judicial Notice**

6           As a threshold matter, the Court considers the parties' respective requests for judicial notice.

7           **A.      Defendants' Request for Judicial Notice**

8           Defendants ask the Court to judicially notice excerpts of GSV's December 23, 2003, proxy

9   statement, various GSV SEC filings, a press release, a schedule of historic stock prices for GSV, and

10  a copy of the certificate of the organization for Defendant O'Neill Acquisition. Federal Rule of

11  Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that

12  it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot

13  reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly

14  consider documents "whose contents are alleged in a complaint and whose authenticity no party

15  questions, but which are not physically attached to the [plaintiff's] pleadings." *Branch*, 14 F.3d at

16  454.

17          Plaintiff objects to Defendants' request. First, Plaintiff objects insofar as Defendants seek to

18  have the Court take judicial notice of the *truth or accuracy* of the documents. Plaintiff contends that

19  judicial notice is a limited doctrine intended to permit courts to accept the truth of facts whose

20  accuracy cannot reasonably be questioned and that here, the accuracy of the documents at issue is at

21  the heart of Plaintiff's Complaint. Plaintiff acknowledges that the Court may still consider pertinent

22  documents through the incorporation doctrine, which provides adequate ground for the Court to look

23  to SEC filings, press releases, and other documents that are quoted in, described, or that otherwise

24  form the basis of the allegations in the Complaint, for the purpose of determining whether those

25  claims are pled with sufficient particularity. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th

26  Cir. 2001). However, Plaintiff argues that some of the documents Defendants submit here should

27  not even be considered pursuant to the incorporation doctrine. The Court addresses the documents

28  separately.

United States District Court
For the Northern District of California

7

**United States District Court**
For the Northern District of California

### 1.    Exhibit A – the December 23, 2003, Proxy Statement

The first document for which Defendants seek judicial notice is GSV's December 23, 2003, proxy statement, expressly referenced in Plaintiffs' Complaint.  Plaintiffs argue that the Court should not judicially notice the proxy statement because the accuracy of the statement is at the heart of the dispute here.  The Court agrees that the *accuracy* of the proxy statement should not be judicially noticed, but agrees to take judicial notice that the statements contained in the proxy statement were disclosed to the market on December 23, 2003.

### 2.    Exhibits B-I – Excerpts of SEC Filings

Defendants ask the Court to take judicial notice of publicly-available documents that Defendants filed with the SEC.  (Exs. B-I.)  Plaintiffs contend that the documents should not be judicially noticed or even considered pursuant to the incorporation doctrine because the excerpts were not referenced in the Complaint and, as excerpts, do not provide a complete or accurate record of the information they purport to present.  The Court disagrees.  "In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss . . . ."  *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).  Accordingly, the Court takes judicial notice of these documents, not for the truth of the statements contained therein, but in that they were documents that were publicly-filed, and the statements contained in them were made to the public, on the dates specified therein.

### 3.    Exhibit J – Press Release

Defendants seek judicial notice of GSV's March 8, 2004, press release, filed with the SEC on Form 10-K.  (Ex. J.)  Plaintiffs contend that the press release was not referenced in the Complaint and should not be judicially noticed.  First, the Court notes that while the press release was not explicitly referenced in the Complaint, it was implicitly referenced.  (*See* Complaint, ¶ 7 ("on March 24, 2004, the Company announced an amendment to the Merger Agreement . . . ."))  Moreover, because the press release, filed with the SEC, is a public filing, it, like the documents discussed above, may be judicially noticed.  *Calpine*, 288 F. Supp. 2d at 1076; *see also In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814, 817 (N.D. Cal. 2004) (the court may take judicial notice of press releases).  The Court thus takes judicial notice of Exhibit J.  Again, however, the Court

1  declines to take judicial notice of the *accuracy* of the statements contained in the press release.  The

2  Court only takes judicial notice that Exhibit J, and the statements contained therein, was disclosed to

3  the public on March 24, 2004.

4          **4.      Exhibit K – Scheduled of GSV Stock Prices For September 2003**

5          Defendants request that the Court take judicial notice of GSV's published stock prices for the

6  month of September 2003.  (Ex. K.)  In the context of a motion to dismiss a securities action, a court

7  may take judicial notice of a company's public stock prices.  *Homestore.com*, 347 F. Supp. 2d at

8  816.  Accordingly, the Court takes judicial notice of these documents, not for the truth of the

9  statements contained therein, but for the fact that they were publicly-filed, and that the statements

10 contained in them were made to the public, on the dates specified therein.

11         **5.      Exhibit L – Certificate of Organization of Defendant O'Neill Acquisition**

12                 **Co., LLC**

13         Defendants ask the Court to take judicial notice of Defendant O'Neill Acquisition Co.,

14 LLC's certificate of organization.  Plaintiffs object as this document is not referenced in the

15 Complaint.  Plaintiffs contend that Defendants only seek judicial notice of the document so that the

16 Court may conclude that, as a matter of fact, O'Neill Acquisition did not exist in any form prior to

17 January 12, 2004.  The Court disagrees.  First, as a document that is capable of accurate and ready

18 determination by resort to sources whose accuracy cannot be questioned, this document fits squarely

19 within the confines of FRE 201.  Indeed, district courts routinely take judicial notice of public

20 documents such as certificates of incorporation or organization filed with the secretary of state.  *See,*

21 *e.g., Michael v. U.S. Filter Corp.*, 2001 U.S. Dist. LEXIS 3918, *27 (C.D. Cal. Feb. 22, 2001).

22 Second, with respect to Plaintiff's concern about the inference the Court may draw from the

23 document, the Court only takes judicial notice of fact that the document was filed with the secretary

24 of state on the date stated therein and nothing more.

25         **B.      Plaintiff's Request for Judicial Notice**

26         Plaintiff argues that in the interest of full disclosure, the Court should judicially notice the

27 enter documents of which the excerpts provided by Defendants are only a part.  Defendants do not

28 quarrel with Plaintiff's request as to Exhibits A, B, and C, attached to the Declaration of Debbie J.

**United States District Court**
For the Northern District of California

9

United States District Court

For the Northern District of California

1  Herman, and the Court accordingly takes judicial notice of those documents.  However, with respect

2  to Exhibits D–G, attached to the Herman Declaration, Defendants contend that because those

3  documents are not referenced or relied on in the Complaint, they should not be judicially noticed.

4  *See Schneider v. Cal. Dept. of Corrections*, 151 F.3d 1194, 1197 (9th Cir. 1997).

5  Exhibit D is a *Business Wire* press release entitled, "The Wine Group Withdraws From

6  Bidding for Golden State Vintners," dated March 25, 2004.  Plaintiff references this press release in

7  his Opposition to Defendants' motion, but not in his Complaint.  Likewise, Exhibit E is a proxy

8  statement filed by GSV with the SEC on May 12, 2004.  This document is neither referenced nor

9  relied upon in Plaintiff's Complaint.  Thus, neither Exhibits D nor Exhibit E should be judicially

10  noticed here.

11  Exhibit F is a *Business Wire* press release, dated May 14, 2004, in which GSV reported its

12  3Q04 results.  This document is explicitly referenced in Plaintiff's Complaint, and should, therefore,

13  be judicially noticed.  (*See* Complaint, ¶ 56.)

14  Exhibit G is a document showing GSV's stock price for the period September 2, 2003, to

15  July 14, 2004.  Because GSV's stock price, between September 2003 and April 2004 is at issue here,

16  and, as discussed above, because a court may take judicial notice of a company's public stock prices

17  in the context of a motion to dismiss a securities action, the Court hereby takes judicial notice of this

18  document.  *Homestore.com*, 347 F. Supp. 2d at 816.

19  Accordingly, the Court **DENIES** Plaintiff's request to judicially notice Exhibits D and E, but

20  **GRANTS** Plaintiff's request for judicial notice of Exhibits A–C, F, and G.

21  **II.     Defendants' Motion to Dismiss**

22  Defendants contend that all three of Plaintiff's claims should be dismissed because as to

23  each, Plaintiff has failed to satisfy the heightened pleading requirements under the PSLRA and Rule

24  9(b).  The Court examines each of Plaintiff's claims separately.

25
26  **A.     Plaintiff's First Cause of Action Against All Defendants – Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5**

27  Section 10(b) of the Act provides, in part, that it is unlawful "to use or employ in connection

28  with the purchase or sale of any security registered on a national securities exchange or any security

10

not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

For a claim under Section 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege:  (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). As discussed above, in order to avoid having his action dismissed, Plaintiff must "plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). The Ninth Circuit, in *Ronconi*, articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.' Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

*Id*. (citations and internal quotation marks omitted).

Here, Plaintiff alleges that four statements or omissions attributable to Defendants were false and misleading and that Defendants knew the statements were false and misleading at the time the statements were made. He alleges that: (1) in the December 23, 2003, Proxy, Defendants falsely stated the fairness of the reverse stock split proposal, thereby undervaluing the Company's business and its prospects; (2) in the December 23, 2003, Proxy, Defendants falsely stated the reasons for the reverse stock split proposal, thereby undervaluing the Company's business and its prospects; (3)

1   Defendants concealed the January 7, 2004, third-party expression of interest in acquiring the

2   Company until they could formulate their plan to acquire GSV themselves; and (4) in the January

3   20, 2004, press release, Defendants misrepresented the reasons for suspending the reverse-split

4   transaction.  Defendants contend that Plaintiff has failed to plead these alleged misrepresentations or

5   omissions with sufficient particularity and has failed to plead facts that, if true, would raise a strong

6   inference that Defendants acted with scienter.  The Court examines each alleged statement

7   separately.

8                      **1.       December 23, 2003, Proxy Statement - the Fairness Opinion**

9        Plaintiff alleges that the Proxy disseminated to GSV shareholders on December 23, 2003,

10  undervalued GSV's financial outlook by falsely assuring shareholders that $3.25 per share was a fair

11  price in the going-private scheme.  Plaintiff alleges that Defendants were aware, at the time the

12  Proxy issued, that the Company was actually on track to report revenue and earnings for the quarter

13  that substantially exceeded the revenue and earnings projected in the Proxy, as evidenced by O'Neill

14  Acquisition's willingness, on January 9, 2004, to compete against the third-party expression of

15  interest in buying the Company for $5 per share.  Defendants argue that Plaintiff has not pled the

16  falsity of these alleged misrepresentations with sufficient particularity, nor has Plaintiff sufficiently

17  pled scienter.  The Court agrees.

18                      **a.       Falsity**

19       Defendants contend that Plaintiff has pled no facts to support its allegation that the statement

20  in the Proxy, that $3.25 per share was a fair price for shareholders, was false.  They argue that when

21  the opinion was prepared – on September 11, 2003 – both the Board and AH&H (based on

22  information provided by the Board) only had the benefit of the Company's first quarter numbers,

23  which were lower than projected, and that $3.25 as of that point in time was a fair price for

24  shareholders.  Defendants also contend that even as of December 23, 2003, the $3.25 price was fair.

25  They argue that even assuming it was known at that time that earnings in the second quarter would

26  far exceed expectations, the Company had historically reported significantly higher earnings during

27  its second quarters (due to the seasonal nature of the wine industry (i.e. the "grape crush" occurs in

28  the fall)) and that did not necessarily suggest that the Company was on track to do far better

**United States District Court**
For the Northern District of California

12

1    financially, in FY 2004, than projected.

2          Plaintiff argues that the Complaint adequately alleges the falsity of the fairness statement.

3    First, the Company's earnings for the second quarter, which ended on December 31, 2003, just a

4    week after the Proxy issued, far exceeded expectations,[6] and it is not believable that the Company

5    would have earned all the "extra" profits in that last week.  Second, Plaintiff contends that the

6    statement was false at the time it was issued, on December 23, 2003, and that whether the fairness

7    opinion was accurate on September 11, 2003, is not relevant.  Even if it were, Plaintiff argues, the

8    Complaint sufficiently alleges that even as of September 11, 2003, AH&H's fairness opinion was

9    false because it was based on the internal projections provided by Defendants O'Neill and Brown

10   who "purposely manipulated the Company's projections downward in order to consummate [the]

11   Reverse Split Scheme."  (Complaint ¶ 28.)  The Court agrees with Defendants here.

12          A representation in a proxy statement that a proposed plan of action is "fair, from a financial

13   point of view, to the shareholders" is a statement of opinion.  *McKesson HBOC*, 126 F. Supp. 2d at

14   1265.  To plead the falsity of a statement of opinion, a plaintiff must "plead with particularity why

15   the statement of opinion was objectively and subjectively false."  *Id*.  A fairness opinion is

16   "objectively false" if the subject matter of the opinion is not, in fact, fair, and is "subjectively false"

17   if the speaker does not, in fact, *believe* the subject matter of the opinion to be fair.  *Id*.[7]

18          Plaintiff has not sufficiently pled that the opinion that $3.25 per share was fair was

19   objectively false.  Plaintiff is right that the relevant inquiry is whether the statement was false as of

20   December 23, 2003, when the opinion was disseminated to the public.  However, Plaintiff has not

21   sufficiently pled contemporaneous facts that would support his theory that the fairness opinion was

22   false or misleading even by December 23, 2003.  Plaintiff alleges that post-statement events (e.g. the

23   revelation that the financial results for 2Q04 were better than predicted, the Wine Group's $5 per

24   share offer in early January, and Defendant O'Neill's January 9, 2003, statement to the GSV Board

---

26   [6] At the close of 2Q04, the numbers indicated that GSV was on track to report revenues of $100 million for the year, not the $75 million projected months earlier, and net income far more than the projected $2.7 million.  (Complaint, ¶ 29.)  These numbers were not reported until February 2004.

28   [7] Plaintiff contends that the *McKesson* case is inapposite here because it dealt with an investment bank's fairness opinion in the context of a Section 14 claim.  The Court is not persuaded that the rule set forth in *McKesson* would not apply equally to a Section 10(b) claim.

United States District Court
For the Northern District of California

13

that he would try to match the Wine Group's offer) to support his contention that the Company's business prospects were better than the Proxy led shareholders to believe. "In some cases involving fraud, a plaintiff may explain why a statement is false or misleading by merely pointing to facts that were later revealed which, due to their nature, were necessarily in existence at the time the statement was made." *In re Oak Tech. Sec. Litig.*, 1997 U.S. Dist. LEXIS 18503, *8 (N.D. Cal. 1997). Here, however, the later-revealed facts cited by Plaintiff are insufficient under the PSLRA.

First, Plaintiff's allegation that beating expectations in the second quarter (which ended *after* the Proxy issued) meant that $3.25 per share was no longer fair is unsupported. As Plaintiff acknowledges in his Complaint, GSV historically reported higher revenues and income in the first part of the fiscal year. (Complaint, ¶ 23.)[8] Given that historical trend, Plaintiff has not provided a sufficient factual basis for alleging that the fairness of $3.25 per share was objectively false. Second, Defendant O'Neill's representation to the Board, on January 9, 2003, that he would try to match the Wine Group's offer does not prove, even under *Oak Technologies*, that $3.25 per share was not fair as of December 23, 2003.[9] Accordingly, the post-statement events Plaintiff relies on to support his allegation that the fairness opinion was false are insufficient here.

Plaintiff also attempts to support his allegation by asserting that during the first quarter of 2004 (July 1, 2003 through September 30, 2003), Defendants (or some of them) manipulated the numbers provided to AH&H in order to get a fairness opinion on the $3.25 per share proposal. Plaintiff only alleges, very generally, that Defendants "purposely manipulated the Company's projections *downward*." (Complaint, ¶ 28 (emphasis in original).) This is insufficient to meet the stringent pleading requirements of the PSLRA.

Finally, the Court notes that the December Proxy itself is explicit that AH&H's fairness analysis was performed during the first quarter and that the fairness of the $3.25 per share proposal was specific to the September 2003 time period. (*See* Dickey Decl., Ex. A (Proxy) at 27 ("*as of*

---

[8] Plaintiff's own calculations suggest that GSV reported losses of $0.38 and $0.33 per share in the second half of its 2002 and 2003 fiscal years, respectively. (*See* Complaint, ¶ 23.)

[9] Having failed to plead with particularity how the fairness opinion was *objectively* false, the Court need not examine whether Plaintiff sufficiently pled that the fairness opinion was *subjectively* false.

*September 11, 2003*, the cash consideration of $3.25 per pre-split share payable to stockholders . . . is fair . . . .") (emphasis added).)  This suggests that a reader of the Proxy was aware that the fairness opinion had not been updated to reflect changes, if any, in the Company's outlook between September 11, 2003, and December 23, 2003.

Accordingly, the Court finds that Plaintiff has failed to plead specific facts to support its allegations that the fairness opinion disclosed in the Proxy Statement was false.

**b.    Scienter**

The PSLRA requires securities fraud plaintiffs to plead "in great detail" that each defendant participated in making false or misleading statements of present or historical fact with either (1) actual knowledge that a statement being made is false, or (2) intentional recklessness to the truth of a statement at the time it is made. *Silicon Graphics*, 183 F.3d at 977.  Such plaintiffs must allege facts that give rise to a "strong inference" of at least deliberate recklessness.  *Id*. at 974.  To satisfy the "strong inference" requirement, the Complaint must contain particularized "'allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.'" *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) (citing *Ronconi*, 253 F.3d at 432).

Here, Defendants argue that even assuming Plaintiff has pled falsity with sufficient particularity, Plaintiff has failed to plead facts that raise a strong inference that any Defendant acted with scienter in issuing the December Proxy.  Defendants contend that Plaintiff has offered "nothing more than speculation, conjecture and the boilerplate allegation that by virtue of their positions with the Company," Defendants had access to facts indicating that $3.25 per share was *not* fair to shareholders as of December 23, 2003.  (Motion at 19:3-5.)

Plaintiff contends that his Complaint raises a strong inference that Defendants acted with scienter when they told the public that $3.25 per share was fair.  He argues that the details alleged in the Complaint, when viewed in their totality, establish that Defendants acted with, at least, deliberate recklessness.  Plaintiff cites *Howard v. Everex Systems* for the proposition that a combination of the defendants' motive along with red flags of the company's financial condition were sufficient to establish scienter.  228 F.3d 1057, 1064 (9th Cir. 2000).  The Court agrees with Defendants.

United States District Court
For the Northern District of California

1    Plaintiff has not alleged that any Defendant was aware of specific facts on December 23,

2    2003, when the Proxy issued, that, if true, would suggest that any of them knew that GSV would

3    materially outperform expectations for FY2004.  Plaintiff instead relies on the fact that just a few

4    months later, the Company was the subject of a bidding war that elevated the stock price to more

5    than $8.00 per share, more than a 250% increase from the stated fair value of $3.25 per share in

6    December, and that as members of management with access to the Company's books, Defendants

7    *must have known*, in December, that the Company was poised to prosper.  The Court finds that these

8    facts, even if true, are insufficient to support a "strong inference" that Defendants acted with

9    deliberate recklessness (or more) when they issued the fairness opinion.  Although a defendant's

10   position in a company can support a reasonable inference that he would be aware of the falsity of

11   statements relating to large deals, *see Read-Rite*, 335 F.3d at 848, here, Plaintiff has not pled specific

12   contemporaneous facts known to Defendants that suggest they knew that the projections were

13   misleadingly low.  Plaintiff also relies on his theory that Defendants had a motive to mislead.

14   However, "plaintiffs proceeding under the PSLRA can no longer aver intent in general terms of

15   mere 'motive and opportunity'. . . , but rather, must state specific facts indicating no less than a

16   degree of recklessness that strongly suggests actual intent."  *Silicon Graphics*, 183 F.3d at 979.

17   Having failed to plead falsity with sufficient particularity and having failed to plead facts that

18   support a strong inference of scienter, the Court finds that Plaintiff's allegation that the fairness

19   opinion was false and misleading cannot survive Defendants' motion to dismiss under the PSLRA.

20   **2.    December 23, 2003, Proxy Statement – Purpose of Going-Private Scheme**

21   Plaintiff alleges that the reason given for the going-private scheme, that the Company would

22   save more than $900,000 per year in reporting-related expenses, was misleading.  Plaintiff alleges

23   that the real reason for the proposed reverse stock split plan was to induce shareholders to agree to

24   sell their shares at an artificially-deflated price so that O'Neill Acquisition could acquire the

25   Company for less than it was worth and reap the benefits of GSV's increasing profits.  (Complaint,

26   ¶¶ 3, 9(b), 9(c).)  Defendants contend that Plaintiff has not pled the falsity of this omission with

27   sufficient particularity, nor has Plaintiff sufficiently pled scienter.  The Court agrees.

28   Defendants argue that Plaintiff has failed to allege facts that Defendants intended, through

United States District Court

For the Northern District of California

1  the reverse stock split plan, to divert the increasing value of the Company for themselves.[10]  The

2  Court agrees.  Plaintiff has provided insufficient facts to support his allegation that in December,

3  Defendants' plan was to artificially deflate the value of GSV so that they (or a subset thereof) could

4  purchase the Company at a reduced price.  Instead, Plaintiff relies on O'Neill Acquisition's

5  submission of multiple bids to buy the Company not long after the Proxy issued to support his

6  allegation that Defendant O'Neill (and the other Defendants) knew, in December, that financial

7  success was afoot.  Plaintiff also claims that the fact that the Company paid O'Neill Acquisition a

8  $2.3 million termination fee (more than three times the amount to be saved by the going-private

9  scheme) when the merger fell through, supports his allegation that the reason given for the scheme

10 in the Proxy was false.  The Court, however, finds these facts insufficient to meet the PSLRA's

11 heightened pleading standards.  Plaintiff has failed to allege facts that raise a strong inference that

12 Defendants initiated the going-private scheme so that they (or the soon-to-be-formed O'Neill

13 Acquisition) could buy the Company at a reduced price.

14           **3.      Failure to Disclose the January 7, 2003, Third-Party Offer**

15           Plaintiff alleges that Defendants' failure to disclose the January 7, 2004, third-party offer

16 from the Wine Group to buy GSV for, at a minimum, $5.00 per share, was false and misleading.

17 Plaintiff alleges that this third-party offer thwarted Defendants' attempts to take the Company

18 private and that Defendants concealed the offer from the public so they could modify their plan to

19 acquire the Company in a management-led buyout.  (Complaint, ¶ 4.)  Defendants contend that

20 Plaintiff has not pled the falsity of this omission with sufficient particularity, nor has Plaintiff

21 sufficiently pled scienter.  Again, the Court agrees.

22           "To be actionable under the securities laws, an omission must be misleading."  *Brody v.*

23 *Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "Silence, absent a duty to

24 disclose, is not misleading under Rule 10b-5."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17

25

26           [10] Defendants focus their argument here on how they would not have directly benefitted, in terms
   of their ownership interest in GSV, from the going-private scheme at all.  (*See* Motion at 12:6–14.)
27 However, because Plaintiff's allegations clearly focus on Defendants' alleged larger scheme to
   artificially deflate the value of the Company so that O'Neill and his to-be-formed company could buy
28 GSV for less than it was worth, the Court need not address Defendants' contentions that the going-
   private scheme, without more, would not have benefitted Defendants.

(1988).  Defendants argue that Plaintiff has not alleged any duty, on the part of Defendants, to

disclose the Wine Group's January 7, 2003, expression of interest in purchasing GSV for $5.00 per

share.  Plaintiff contends that because Defendants had announced, only two weeks before the Wine

Group expressed interest, that $3.25 per share was a fair price for shareholders as part of the going-

private scheme, Defendants had a duty to update shareholders on the value of the Company and their

stock.  The Court disagrees.

     The *Brody* case, cited by Defendants, is on all fours here.  An omission is not misleading

unless it "affirmatively creates an impression of a state of affairs that differs in a material way from

the one that actually exists."  280 F.3d at 1006.  In *Brody*, the defendant THC's board had

announced, in August of 1996, its plan to buy back $25 million worth of shares from stockholders.

In February 1997, Vencor, a third party, submitted to the THC board a written offer to purchase

THC for more than the price per share at which THC stock was currently trading.  THC did not

announce the third-party offer.  In a March press release, THC detailed the progress of its stock

repurchasing program and made no mention of any party's interest in acquiring THC.  The securities

plaintiffs claimed that omitting the purchase offer misled investors.  The Ninth Circuit disagreed and

held that because the defendants had never suggested to the public that no merger or acquisition was

in the works, the public had not been misled.  The same is true here.  While Plaintiff contends that

because Defendants undertook to say anything at all here (by issuing the January 20 press release),

they should have disclosed the third-party offer, he does not allege that Defendants ever suggested in

any way to the public that no merger or acquisition was imminent.  Thus, Defendants' failure to

disclose the Wine Group's offer was not misleading under Section 10(b) and Rule 10b-5.[11]

---

[11] The cases cited by Plaintiff here do not mandate a different result.  For example, in the *Phillips Petroleum* case, the Third Circuit held that "a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised."  *In re Phillips Petroleum Sec. Litig.*, 881 F.3d 1236, 1245 (3d Cir. 1989).  In that case, a partnership attempting a hostile takeover of Phillips issued a press release stating that it had acquired 5.7 % of the company's outstanding shares, would commence a tender offer, and "would not sell any Phillips shares . . . back to Phillips except on an equal basis with other shareholders."  Two weeks later, the partnership and Phillips reached an agreement in which the partnership agreed, in direct contradiction to its promise, to sell back some of its shares to Phillips at a different price from that negotiated for other shareholders.  The press release had promised one thing and within two weeks, the partnership went back on the promise, such that the failure to disclose the change amounted to a false and misleading statement under the securities laws.
     The facts here are entirely different.  Plaintiff has not alleged that Defendants ever said that there

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Accordingly, the Court finds that this allegation was not pled with sufficiently particularity to

2    survive a motion to dismiss.

3
                    **4.      January 20, 2004 Press Release – Reason For Suspending Going-Private**
4                              **Plan**

5            Plaintiff relatedly alleges that Defendants misled shareholders when they explained, in the

6    January 20, 2004, press release, that the Company was suspending the going-private scheme due to

7    "recently improved business and market conditions."  Plaintiff alleges that Defendants actually

8    suspended the reverse stock split scheme because their plans to take the Company private for $3.25

9    per share were being foiled by the third-party offer from the Wine Group and they wanted to delay

10   the selling process long enough to ensure that O'Neill Acquisition could come up with the premium

11   offer.  (Complaint, ¶ 5.)  Defendants contend that Plaintiff has not pled the falsity of this omission

12   with sufficient particularity, nor has Plaintiff sufficiently pled scienter.  The Court agrees.

13           Plaintiff's allegations in this regard are tied to his allegation that Defendants misled

14   stockholders by failing to disclose the Wine Group's $5 per share acquisition offer.  Plaintiff admits

15   that it may have been true that business and market conditions had "recently improved," but that

16   because this was not the whole story behind suspending the reverse stock split plan, the statement

17   was misleading.  Again, the Court finds the *Brody* case instructive.  An omission is not misleading

18   unless it "affirmatively creates an impression of a state of affairs that differs in a material way from

19   the one that actually exists."  280 F.3d at 1006.  Here, Plaintiff has not pled any facts that

20   Defendants suggested, in their January 20 press release, that no merger or acquisition was imminent.

21   Additionally, Plaintiff does not suggest that the reason provided for the suspension of the going-

22   private scheme was untrue.  Plaintiff's allegations in this case are no more specific or detailed than

23   those made in *Brody*, and thus cannot support a claim for fraud.

24           Plaintiff attempts to distinguish *Brody* on the ground that, unlike the plaintiff in that case, he

25   "adequately specifies why the January 20 statements were false."  (Opposition at 10 (citing

26   Complaint, ¶¶ 31, 43–44.)  However, as Defendants point out, the paragraphs of the Complaint to

27   _____

28   would be no merger or acquisition.  Therefore, Plaintiff has failed to sufficiently plead his allegation
     that Defendants' failure to disclose the Wine Group's $5 per share offer was misleading and a violation
     of securities laws.

1   which Plaintiff cites do not support that contention.  (*See* Complaint, ¶¶ 31 (alleging that third

2   parties Uberoi and Bratton bought shares of GSV stock after January 7, 2004), 43 (quoting the

3   January 20, 2004, press release), & 44 (alleging that GSV's shares were trading below $4 per share

4   on January 20, 2004).)  Accordingly, the Court finds that Plaintiff has failed to meet the stringent

5   pleading requirements of the PSLRA with respect to his allegation that the January 20 press release

6   was designed to mislead.

7                               **5.    Allegations as a Whole**

8        In sum, Plaintiff has failed to allege particularized facts that could lead the Court to infer that

9   Defendants misrepresented, with deliberate recklessness, the details of GSV's second quarter sales

10  numbers, the reason behind the going-private scheme, or that $3.25 per share was a fair price for

11  shareholders.  Plaintiff has also failed to sufficiently allege that Defendants omitted the third-party

12  expression of interest with an intent to mislead shareholders.  Finally, Plaintiff has failed to allege

13  sufficiently particular facts to support his allegation that the reason provided for the suspension of

14  the going-private scheme was false.  Because Plaintiff's first cause of action "lacks sufficient detail

15  and foundation necessary to meet either the particularity or strong inference requirements of the

16  PSLRA," it must be dismissed.  *Silicon Graphics*, 183 F.3d at 984.

17
18  **B.    Plaintiff's Second Cause of Action Against All Defendants – Violation of Section
            20(a)**

19       Section 20(a) of the Securities Exchange Act ("Exchange Act") provides derivative liability

20  for those who control others found to be primarily liable under the Act.  *In re Ramp Networks, Inc.*

21  *Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002).  Where a plaintiff asserts a Section 20(a)

22  claim based on an underlying violation of Section 10(b), the pleading requirements for both

23  violations are the same.  *Id*.  "To be liable under section 20(a), the defendants must be liable under

24  another section of the Exchange Act."  *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971,

25  978 (9th Cir. 1999).

26       Here, Plaintiff alleges that Defendants Brown, O'Neill, and Kelleher acted as controlling

27  persons of GSV within the meaning of Section 20(a) of the Act and are liable thereunder for the

28  conduct alleged.  Plaintiff claims that by reason of their positions as officers and/or directors of the

United States District Court
For the Northern District of California

20

United States District Court

For the Northern District of California

1   Company, their ownership of a substantial number of shares of GSV stock and/or their positions as:

2   (1) those responsible for preparing and disseminating GSV's public releases; and/or (2) the primary

3   GSV negotiators with O'Neill Acquisition in connection with the sale of the Company to O'Neill

4   Acquisition, Defendants Brown, O'Neill, and Kelleher had the power and authority to cause the

5   Company to engage in the wrongful conduct complained of.  Defendant argues that this cause of

6   action fails because Plaintiff has failed to state a cause of action pursuant to Section 10(b).  The

7   Court agrees.  Because Plaintiff has failed to adequately plead the underlying 10(b) violation, as

8   discussed *supra*, Plaintiff's Section 20(a) claim must also be dismissed.

9

10        **C.    Plaintiff's Third Cause of Action Against Defendant O'Neill Acquisition Only –
                   Violation of Section 20A (Insider Trading)**

11          Section 20A of the Securities Exchange Act prohibits sales by any person who trades in

12   securities while in possession of material nonpublic inside information.  Insider trading claims under

13   Section 20A "require a predicate violation of a securities law, contemporaneous trading of defendant

14   and plaintiff, and a profit gain or loss."  *Howard v. Hui*, 2001 U.S. Dist. LEXIS 15443, at *19 (N.D.

15   Cal. Sept. 23, 2001).

16          Plaintiff alleges that Defendant O'Neill Acquisition engaged in illegal insider trading during

17   the Class Period because members or affiliates of O'Neill Acquisition – non-defendants Uberoi and

18   Bratton – bought 176,580 shares of GSV stock in the open market after the Wine Group made its

19   $5.00 per share offer but before the public knew about the offer.  Defendants contend that this claim

20   fails on several grounds.  First, Plaintiff has failed to adequately plead that Defendants violated

21   Section 10(b) such that there is no predicate violation.  Even if a predicate violation had been

22   sufficiently pled, Defendants contend that Plaintiffs fail to allege that: (1) the two people Plaintiff

23   alleges improperly purchased GSV stock are not defendants here and Plaintiff does not allege that

24   Defendant O'Neill Acquisition traded any GSV securities during the relevant time period; (2)

25   Uberoi and Bratton – as member/affiliates of O'Neill Acquisition – purchased shares

26   contemporaneously with Plaintiff's sales; and (3) assuming Plaintiff intended to allege that Uberoi

27   and Bratton were unlawfully tipped, by Defendant O'Neill or someone else, about the undisclosed

28   $5.00 per share offer, Plaintiff has not alleged with particularity the details of the tipping theory.

21

1    The Court addresses each argument separately.

2         First, the Court agrees that having failed to sufficiently allege predicate violations of the

3    securities laws, Plaintiff's Section 20A claim must fail.

4         Second, assuming, *arguendo*, that Plaintiff had pled a predicate violation here, Plaintiff's

5    insider trading claim would still fail.  Plaintiff has not sufficiently pled the link between Defendant

6    O'Neill (or other insiders) and non-defendant purchasers Uberoi and Bratton.  If he is trying to

7    allege that Defendant O'Neill knew about the undisclosed $5.00 per share offer to acquire GSV and

8    told Uberoi and Bratton, with whom he was about to go into business to take over GSV, about that

9    offer, rendering Uberoi's and Bratton's subsequent mass purchase of GSV shares (at no more than

10   $3.52 per share) a violation of securities laws, he must plead that allegation with particularity.  He

11   has not done so here.  (*See* Complaint, ¶ 31.)  This is particularly true in light of the fact that there is

12   no indication, in Plaintiff's Complaint, that Uberoi's and Bratton's purchases between January 7 and

13   January 21 were abnormal.  Accordingly, the Court finds that Plaintiff has not pled his third cause of

14   action for insider trading with sufficient particularity.  That claim is therefore **DISMISSED**.

15   **II.    Dismissal Without Prejudice**

16        Plaintiff requests, in the event that the Court finds that the Complaint is not plead with

17   sufficient particularity such that it should be dismissed, that the Court grant Plaintiff leave to amend.

18   Leave to amend under Federal Rule of Civil Procedure 15 is liberally granted.  "Dismissal with

19   prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could

20   not be saved by amendment."  *Eminence Capital v. Aspeon Inc.*, 316 F.3d 1048, 1053 (9th Cir.

21   2003) (error to refuse leave to amend in a securities fraud case to allow plaintiff to plead scienter).

22   Here, it is possible that Plaintiff could remedy his significant pleading defects in an amended

23   complaint by adding detailed factual support for his allegations of false or misleading statements,

24   and demonstrating that Defendants had the requisite scienter at the time the statements were made.

25   Accordingly, the Court **DISMISSES** Plaintiff's Complaint without prejudice.

26   ///

27   ///

28   ///

22

United States District Court

For the Northern District of California

1

**CONCLUSION**

2          For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss in its

3    entirety, without prejudice.  Plaintiff must file an amended complaint within forty-five days of the

4    date of this Order.  The failure to do so will result in the dismissal of the action with prejudice.

5          This Order terminates docket entry no. 20.

6

7

8          **IT IS SO ORDERED.**

9

10

11

12

13    Dated: August_10_, 2005                    MARTIN J. JENKINS
                                                 UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California